IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-02513-REB-MJW

BRANZAN ALTERNATIVE INVESTMENT FUND, LLLP,
*on behalf of itself and all others similarly situated*,

Plaintiff,

v.

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., and
ENERGY CORPORATION OF AMERICA,

Defendants.

---

**REPORT AND RECOMMENDATION**
**on**

**DEFENDANT THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.'S**
**AMENDED MOTION TO DISMISS**
**(Docket No. 30)**
**and**

**DEFENDANT ENERGY CORPORATION OF AMERICA'S**
**AMENDED MOTION TO DISMISS**
**(Docket No. 32)**

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**

Energy Corporation of America ("ECA") created a trust, which sold shares of itself to the public and used the capital to purchase an oil-and-gas royalty interest from ECA. The Bank of New York Mellon Trust Company ("Trustee") was serving as trustee during the trust's scheduled liquidation in 2013. Plaintiff had invested $1 million in the trust—and in this class action, Plaintiff alleges that Trustee rigged the trust's liquidation to favor ECA at the expense of investors like Plaintiff.

2

Plaintiff's lawsuit alleges several breaches of contract by ECA and Trustee, both of whom have moved to dismiss the claims against them.  (Docket Nos. 30 & 32.) District Judge Robert E. Blackburn referred the motions to the undersigned.  (Docket Nos. 31 & 33.)  The Court has considered the motions and briefs, taken notice of the court's file, and considered the relevant Federal Rules of Civil Procedure, statutes, and case law.  Now being fully informed, the Court recommends that the motions to dismiss be granted in part and denied in part.

## Facts as Alleged

Plaintiff claims breaches of two discrete contracts: one creating the trust ("Trust Agreement," Docket No. 1-4), and one conveying a royalty interest to the trust ("Royalty Conveyance," Docket No. 1-5).  Both contracts are part of the same transaction. (Docket No. 5 ¶¶ 2–4.)

### *The Planned Transaction*

ECA created the trust in January 1993, acting through a wholly owned subsidiary that has since merged with ECA.  (*Id.* ¶¶ 26, 49–54.)  The purpose of the trust was to acquire, hold, and sell shares in, gas royalties.  (*See id.* ¶ 64.)  The following March, ECA assigned to the trust a net profits interest in "over 650 producing gas wells."  (*Id.* ¶¶ 64–65.)

On the same day it received the assignment, the trust held an initial public offering—selling 5.9 million units in the trust and raising over $120 million.  (*Id.* ¶¶ 77– 79.)  From this amount, "ECA was paid $93,162,180 for the assignment."  (*Id.* ¶¶ 66,

80–81.)[1]  ECA retained the responsibility for operating the wells and selling the gas;

ECA was reimbursed for its operating costs and earned a fee of 10% of the sales profit.

(*Id.* ¶¶ 67–68.)  ECA paid over to the trust the remaining net profit on a quarterly basis.

(*See id.* ¶¶ 92–93.)  Operating strictly as a pass-through entity, the Trustee paid those

profits (less trust expenses) to Unitholders quarterly.  (*Id.* ¶¶ 37–40.)

    By its terms, the trust was scheduled to terminate no later than May 2013.  (*Id.*

¶ 72.)  In the run-up to that date, Trustee was required to sell the perpetual royalty

interests for the best price, subject to a right of first refusal retained by ECA.  (*See id.* ¶¶

155–56, 161–62, 299.)  The sale could take place in a few different formats; the one

that did take place was an auction.  (*See id.* ¶¶ 255–72, 295–98.)  Three bids were

received, with the highest bid being $6.5 million.  (*Id.* ¶¶ 295–96.)  That bidder went

under contract—until ECA exercised its right of first refusal.  (*Id.* ¶¶ 297, 299.)  Taking

advantage of a market-fluctuations clause in the bidder's contract, ECA actually paid

only $5.9 million for the royalty interest at closing.  (*Id.* ¶¶ 298, 305–07.)

### ***Trustee's Alleged Conflict of Interest***

    In February 2013—after the royalty interest had been sold to ECA, but before the

cash had been distributed and the trust terminated—ECA offered to exchange units in

the trust for units in another investment trust, the "Marcellus Trust."  (*Id.* ¶ 29.)  Investors

representing about 16% of the trust's units took ECA up on this offer, and the exchange

---

[1] Trustee purchased 20-year treasury bonds with the balance of the money;
"whole unit" holders had an interest in these bonds in addition to the royalty income,
while "partial unit" holders had an interest only in the royalty income.  (Docket No. 5,
¶23 & n.1, ¶ 80.)  Plaintiff asserts, and Defendants have not disputed, that neither the
bonds nor the difference between classes of Unitholders are material to the issues in
this case.

4

commenced on March 31, 2013.  (*Id.* ¶ 31)  As a result, ECA became a Unitholder of the trust, owning a roughly 16% stake.  (*Id.*)

Trustee was also the trustee for the Marcellus Trust.  (*Id.* ¶ 29.)  Plaintiff sees this relationship as creating a conflict of interest: Trustee wished to continue doing business with ECA in other endeavors (*i.e.*, the Marcellus Trust), and Trustee was therefore compliant with ECA's wishes as to the trust at issue in this case.  (*See id.* ¶ 47.)  As Plaintiff sees it, this conflict of interest allowed ECA to rig the trust's wind-up in its own favor.

### ***The Alleged Breaches***

Plaintiff alleges a number of breaches of contract, each either depressing the sales price for the trust's royalty interest, or enabling such manipulation—thus allowing ECA to exercise its right of first refusal at a below-market price.  (*See id.* ¶¶ 185–87; 205–08.)

Trustee's alleged breaches generally take the form of insufficient diligence. Specifically, Plaintiff alleges that:

- Trustee failed to review ECA's books, conduct independent audits of those books, or otherwise monitor ECA's compliance with the royalty contract—in sum, doing nothing to ensure that ECA paid the trust the amounts due.  (*Id.* ¶¶ 137–54.)

- Trustee did not honor its obligations to sell the royalty interest according to specific profit-maximizing procedures—most importantly, failing to obtain an independent appraisal of the royalty interest, as required under the Trust Agreement.  (*Id.* ¶¶ 165–75.)  These breaches left the auction of the royalty interest short on public information.  (*Id.* ¶ 176.)

- Trustee failed to abide by the required timeline for the auction.  By the terms of the Trust Agreement, the auction was to be held in March 2013, three and a half months after the independent appraisal was to be procured.  (*Id.*

¶¶ 166, 255–58.)  Instead, Trustee not only failed to procure the independent appraisal, but also held an auction on October 18, 2012—only three weeks after the initial bid packets were issued to potential bidders.  (*Id.* ¶¶ 263–64.)

- Trustee failed to take any steps to question or verify the legal positions and factual representations that ECA claimed about the royalty interest in the run-up to the sale, as described below.  (*Id.* ¶¶ 243–53, 273–87.)

The combined effect of Trustee's breaches was to create a hurried, low-information, non-transparent auction that ECA could easily manipulate.  (*Id.* ¶¶ 254, 265–72.)  Further, the accelerated auction allowed more post-auction time for ECA to make the Marcellus Trust swap with Unitholders, thereby allegedly benefitting Trustee (as the trustee of the Marcellus Trust).  (*Id.* ¶¶ 259–62.)

ECA's alleged breaches take the form of manipulating the auction to depress the auction price.  (*See id.* ¶¶ 230–42.)  Specifically:

- Under the contract to operate the wells, ECA had discretion to plug and abandon any well that was no longer capable of producing gas "in paying quantities."  (*Id.* ¶ 99.)  During the auction, ECA announced that it would plug 40 wells, on the basis that the wells were "non-economic."  (*Id.* ¶¶ 103–05.)  Plaintiff claims that these wells have not in fact been plugged or abandoned, and that the announcement was made in bad faith to depress the bidding price.  (*Id.* ¶ 203–12.)

- Under the operating contract, ECA was to be reimbursed by the trust for its operating costs and capital costs.  (*Id.* ¶ 108.)  The operating costs were reimbursed by a set formula rather than by actual cost; capital costs, by contrast, were reimbursed as actually incurred.  (*Id.* ¶¶ 109–12.)  These mechanisms created an economic incentive for ECA to mischaracterize operating costs as capital, to pass them along to the trust.  (*Id.* ¶ 113.)

- On August 28, 2012, ECA sent an informational letter to the trust taking legal positions, and making factual representations, designed to deflate the market value of the royalty interest.  (*Id.* ¶¶ 185–87, 217, 223.)  It took the position that the operating-cost formula described in the Royalty Conveyance would no longer govern post-liquidation, and that ECA's actual operating costs would be reimbursed by the future interest holder—and it further represented that those actual costs were much higher than the formula.  (*Id.* ¶¶ 188–89.)

6

The letter took the position that marketing costs, previously borne by ECA, would shift to the new interest-holder following the sale—and that those costs would be in an unknown amount.  (*Id.* ¶¶ 190–91.)  Finally, it represented (as above) that 40 wells would be plugged, at a cost borne in part by the interest-holder as capital costs.  (*Id.* ¶¶ 192–95.)

- On October 4, 2012, ECA sent a second informational letter to the trust, designed to further deflate the bidding price.  (*See id.* ¶¶ 196, 227.)  Like the previous letter, this letter allegedly took legal positions clouding the property interest to be conveyed or maximizing the expenses associated with the interest, as well as factual positions exaggerating liabilities.  (*Id.* ¶¶ 196–202.)

Each of these actions is alleged to breach ECA's contractual duty, under the Royalty Conveyance, of dealing in good faith and of handling the wells under a reasonably-prudent-operator standard.  (*Id.* ¶¶ 84–98, 218–19, 224–25, 228–29, 237–38.)

### ***Plaintiff's Legal Claims***

Plaintiff seeks to certify a class of all persons holding units in the trust as of October 18, 2012, excluding persons related to or affiliated with Defendants.  (*Id.* ¶ 23.) Plaintiff asserts five claims.

*Count I* alleges that Trustee breached the Trust Agreement "by permitting ECA to purchase the [royalty interest] without complying with the sales procedures" required by the Trust Agreement and "by permitting ECA to exercise a right of first refusal . . . without complying with the contractual provisions in the Trust Agreement."  (*Id.* ¶¶ 339, 341.)

*Count II* alleges that Trustee breached the Trust Agreement "when it failed to call a meeting to allow [Unitholders] to vote on amendments, waivers, consents, and changes to the Trust Agreement and Royalty [Conveyance]"; when it "failed to mail [Unitholders] notice of the bidding process 60 days prior to the deadline for bids"; and

7

when it "failed to provide other material information" it was required to disclose to

Unitholders and other potential bidders.  (*Id.* ¶¶ 347, 350.)

*Count 3* alleges that ECA breached duties owed to Plaintiff and other investors

as third-party beneficiaries of the Royalty Conveyance, when it "made false claims and

took meritless positions" in the August 28, 2012, and October 4, 2012, letters.

*Count 4* alleges, in the alternative to Count 3, that ECA breached duties owed to

the trust and that a class of the trust's Unitholders can proceed against ECA directly,

instead of derivatively, under equitable principles.

*Count 5* alleges that both Trustee and ECA are liable for an equitable accounting

of the amounts paid or owed to the trust by ECA under the Royalty Conveyance.

### Analysis

Both Defendants have moved to dismiss all claims against them under Federal

Rule of Civil Procedure 12(b)(6).  On such a motion, the Court accepts all well-pleaded

facts as true and dismisses the Complaint if those facts fail to state a claim upon which

relief can be granted.  *Khalik v. United Air Lines*, 671 F.3d 1188, 1191–92 (10th Cir.

2012).  Defendants do not challenge the factual sufficiency of the Complaint under

Federal Rule of Civil Procedure Rule 8(a).  *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009);

*Bell Atlantic Corporation v. Twombly,* 550 U.S. 544 (2007).  Rather, Defendants present

various legal and procedural bars to relief.

### I.   ECA's Motion to Dismiss

Plaintiff brings Count III and Count IV in the alternative to each other.  Both

Counts assert that ECA breached its contract with the trust; Count III alleges that

8

Plaintiff and the Trust's Unitholders have standing to sue for that breach as third-party beneficiaries of the contract, while Count IV alleges that Plaintiff and the trust's Unitholders can bring that otherwise-derivative claim directly due to the unique equities of this case.  ECA argues that both theories are wrong.

### A.   Count III: The Trust's Unitholders as Third-Party Beneficiaries of the Trust's Contract with ECA

The parties agree that West Virginia law applies to Count III.  (Docket No. 32, pp.4–5; Docket No. 45, pp.23–27.)  West Virginia's third-party beneficiary statute states:

> If a covenant or promise be made *for the sole benefit* of a person with whom it is not made, or with whom it is made jointly with others, such person may maintain, in his own name, any action thereon . . . .

W. Va. Code § 55–8–12 (emphasis added).  The West Virginia Supreme Court has "repeatedly applied this statute and [has] consistently given force to the 'sole benefit' requirement."  *E. Steel Constructors, Inc. v. City of Salem*, 549 S.E.2d 266, 277 (W. Va. 2001).

Accordingly, a third-party action "may be maintained [only] if the contract is made and intended for the benefit of a class of persons definitely and clearly shown to come within the terms of the contract."  *United Dispatch, Inc. v. E.J. Albrecht Co.,* 62 S.E.2d 289, 296 (W. Va. 1950).  Thus, a subcontractor is not a third-party beneficiary of a general contract simply because the parties know the subcontractor will inevitably benefit from the contract.  *E. Steel Constructors*, 549 S.E.2d 266; *Woodford v. Glenville State College Housing Corp.*, 225 S.E.2d 671 (W. Va. 1976).  But a subcontractor *is* a third-party beneficiary if it is actually named in the general contract as the beneficiary of some promise.  *See Hatfield v. Wilson*, 2012 WL 2888686, at *2–3 (S.D. W. Va. July 13,

9

2012).  Likewise, someone injured by an insured party is not a third-party beneficiary of

the insured's insurance contract, *Elmore v. State Farm Mut. Auto. Ins. Co.*, 504 S.E.2d

893, 901 (W. Va. 1998); *Robinson v. Cabell Huntington Hosp., Inc.*, 498 S.E.2d 27, 32

(W. Va. 1997)—but the named beneficiaries of a life insurance policy, even a class of

contingent beneficiaries, may sue on the policy, *Goff v. Penn Mut. Life Ins. Co.*, 729

S.E.2d 890, 894 (W. Va. 2012).

　　　　Here, it is undisputed that no provision in the Royalty Conveyance conveys any

benefit upon the Unitholders themselves, analogous to a named subcontractor or a

named life-insurance beneficiary.  In such circumstances, the West Virginia Supreme

Court holds:

> In the absence of a provision in a contract specifically stating that such
> contract shall inure to the benefit of a third person, there is a presumption
> that the contracting parties did not so intend and in order to overcome
> such presumption the implication from the contract as a whole and the
> surrounding circumstances must be so strong as to be tantamount to an
> express declaration.

*E. Steel Constructors, Inc. v. City of Salem,* 549 S.E.2d 266, 277 (W.Va.2001) (citing

*Ison v. Daniel Crisp Corp.,* 122 S.E.2d 553 (W.Va.1961)).  Plaintiff argues that the

surrounding circumstances give rise to exactly such an implication—because the

Royalty Conveyance was part of the same overall transaction as the Trust Agreement,

because the expected result of the Royalty Conveyance was for royalties to flow directly

to the trust's Unitholders rather than staying with the trust, and because the Trust

Agreement prohibits the Trustee from amending the Royalty Conveyance contract

without Unitholder approval.

10

The Court disagrees.  Plaintiff's arguments can all be made about virtually any transaction involving an initial public offering.  To begin with, there is nothing unique about a trust agreement that places limits on the trustee's use of the trust corpus, and there is nothing unique about a business entity that exists solely to sell shares in a particular revenue-producing asset.  Plaintiff's argument would apply to all such entities—and there is nothing in West Virginia law suggesting that it gives such a broad scope to third-party claims.  To the contrary, West Virginia law *refuses* to allow such claims unless the third party (or class of third parties) is the "sole beneficiary" of the promise or covenant at issue.  Further, the fact that the Trust Agreement and the Royalty Conveyance were part of the same transaction does not suggest that the enforcement rights of one should be read into the other—rather, the fact that they were drafted contemporaneously suggests that the absence of Unitholder rights in the Royalty Conveyance was quite intentional.

Ultimately, in order to meet West Virginia's "sole beneficiary" standard, Plaintiff would have to establish that the trust itself had no interest in the Royalty Conveyance. Plaintiff cites no West Virginia law that would allow the Court to disregard a business entity's interests simply because those interests align unusually directly with the interests of its shareholders.  Accordingly, the Court concludes that, as to the Royalty Conveyance, third-party beneficiary status is unavailable to Plaintiff and the proposed class of Unitholders.

To avoid this outcome, Plaintiff argues that the intent of the contracting parties is a factual question, and premature at this stage.  But in West Virginia, the interpretation

of a contract is a question of law unless that contract is ambiguous. *Citynet, LLC v. Toney*, 772 S.E.2d 36, 44 (W. Va. 2015). "The mere fact that parties do not agree to the construction of a contract does not render it ambiguous," *id.* (quotation marks and alteration omitted), and the Court sees no ambiguity here. Finally, Plaintiff also argues that it can enforce its rights not as a third-party beneficiary of the contract but as a creditor beneficiary. This is a separate cause of action, arising not under the third-party beneficiary statute but, rather, arising in equity under West Virginia common law. *Pettus v. Olga Coal Co.,* 72 S.E.2d 881, 884–85 (W. Va. 1952). It has not been pleaded in the Complaint, and Plaintiff has not moved for leave to amend the Complaint. As such, the question is not properly before the Court.

The Court recommends that Count III be dismissed.

### B.    Count IV: The Unitholders' Right to Proceed Directly with an Otherwise-Derivative Claim Based on the Equities of the Case

In the alternative to suing on the Royalty Conveyance as third-party beneficiaries, Plaintiff asserts that it and a class of Unitholders can enforce *the trust's* rights under the Royalty Conveyance. Plaintiff concedes that it has not met the procedural prerequisites for bringing a derivative claim, and further concedes that this particular claim would be derivative under ordinary circumstances—but alleges that, under the unique circumstances here, it can bring the claim directly as a matter of equity. ECA moves to dismiss, arguing that Plaintiff's equitable theory is unfounded in Delaware law.

In Delaware, the distinction between direct and derivative claims turns "*solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or

other remedy (the corporation or the stockholders, individually)?"  *Tooley v. Donaldson,*

*Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).  Pointing to the second prong

of that test, Plaintiff argues that equitable considerations of who *should* receive the

recovery come into play.  For support, Plaintiff points to a line of cases purportedly

establishing an "unjust enrichment" doctrine, in which Delaware courts have allowed

minority interests (shareholders, limited partners, etc.) to sue directly, while noting that

direct characterization prevents the controlling interest from unjustly sharing in a

derivative recovery.  *See In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 80

(Del. Ch. 1999); *In re Cencom Cable Income Partners L.P.*, 2000 WL 130629, at *6

(Del. Ch. Jan. 27, 2000); *Anglo American Security Fund L.P. v. S.R. Global Int'l Fund

L.P.*, 829 A.2d 143, 153 (Del. Ch. 2003).  None of these cases are apposite to Count IV,

however, because none of them have anything to do with a third party who breached a

contract with the corporation.

Instead, each of Plaintiff's cases involve suits against a majority shareholder,

general partner, or similar controlling interest, along with the board of directors or other

management acting in concert with that controlling interest.  In each of these cases, the

controlling interest violated duties (contractual or fiduciary) owed to minority interests to

protect them against the majority shareholder or general partner.  As a result, these

cases concern separate, independent harms to the minority interests—harms to their

specific rights as shareholders, rather than harms to the entity that are passed through

to its beneficial owners.  *See, e.g.*, *Gaylord Container*, 747 A.2d at 80 ("After all, the

injury suffered results from the directors' action impeding the stockholders from

13

divesting themselves of their personal property, not from actions of the directors directly impairing the value of the enterprise itself to the indirect detriment of all stockholders."). As the Delaware Supreme Court has explained in analogous circumstances, the facts in such cases give rise to *two* claims—one derivative (for the harm to the entity), and one direct (for the separate harm to the shareholders' rights as shareholders). *Gentile v. Rossette*, 906 A.2d 91, 99–100 (Del. 2006). Thus, in such cases, the two prongs of the *Tooley* analysis both point to the conclusion that the shareholders themselves suffered direct harms. Preventing unjust enrichment is an added equitable consideration supporting the conclusion, but does not stand on its own as a reason why an otherwise-derivative claim might be brought directly.

Here, as to Count IV, Plaintiff cannot point to any structural rights of Unitholders that are implicated by the Royalty Conveyance. The Royalty Conveyance concerns the trust's rights, vis-à-vis ECA. There are no duties in the Royalty Conveyance that are owed to the Unitholders—because the Unitholders' rights are in the Trust Agreement, not the Royalty Conveyance. As will be seen below, Delaware's structural-rights cases are very relevant to Plaintiff's claims against Trustee for violating the Trust Agreement. But there is no conceivable way to extend these cases to an injury to the entity caused by a third party's breach of a contract with that entity.

As a second point, Plaintiff argues that the fact of the trust's dissolution supports direct characterization. But this argument is wholly divorced from the *Tooley* analysis. Plaintiff cites to *Gentile*, 906 A.2d at 103, for support. But *Gentile* specifically held that shareholders gained *two* claims from the conduct at issue—and that while the direct

14

claim could go forward, the derivative claim could not be pursued as a practical matter due to the entity's liquidation. *Id. Gentile* does not stand for the proposition that a derivative claim can be brought directly when the entity is dissolved—it stands for the exact opposite.

The Court recommends that Count IV be dismissed.

### C.  Count V: Equitable Accounting from ECA

Plaintiff's claim for an equitable accounting from ECA is predicated on the rights asserted in Counts III and IV.  Because Counts III and IV fail to state a claim for relief, the alternative remedy of an accounting is also unavailable.  The Court recommends that Count V be dismissed as to ECA.

## II.  Trustee's Motion to Dismiss

Trustee argues that Counts 1 and 2 are both barred by the Trust Agreement's exculpatory clause, and that Count I is independently barred because it is a derivative claim improperly stated as a direct claim.

### A.  Counts I & II: Trustee's Exculpatory Clause

The Trust Agreement contains the following exculpatory clause:

> [Trustee] shall be personally or individually liable only for (a) fraud or acts or omissions in bad faith or which constitute gross negligence and (b) taxes, fees or other charges on, based on or measured by any fees, commissions or compensation received in connection with any of the transactions contemplated by this Agreement . . . .

(Trust Agreement § 6.01.)  Because the Trust Agreement is attached to the Complaint, its provisions are usually fair game on a motion to dismiss.  Fed. R. Civ. P. 10(c).

However, the parties agree that an exculpatory clause constitutes an affirmative

defense under Delaware law—and the rules for affirmative defenses are somewhat

limited at the motion-to-dismiss stage.   As the Ninth Circuit puts it:

> Dismissal under Rule 12(b)(6) on the basis of an affirmative
> defense is proper only if the defendant shows some obvious bar to
> securing relief on the face of the complaint.   If, from the allegations of the
> complaint as well as any judicially noticeable materials, an asserted
> defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is
> improper.

*ASARCO, LLC v. Union Pac. R.*, 765 F.3d 999, 1004 (9th Cir. Aug. 27, 2014) (internal

citations omitted); *accord Radil v. Sanborn Western Camps, Inc.*, 384 F.3d 1220, 1224–

27 (10th Cir. 2004) (deciding that where factual dispute exists as to affirmative defense

in workers' comp statute, issue must be put to the trier of fact); *Bullington v. United Air

Lines, Inc.*, 186 F.3d 1301, 1311 n. 3 (10th Cir. 1999) ("Rule 12(b)(6) is a proper vehicle

for dismissing a complaint that, on its face, indicates the existence of an affirmative

defense such as noncompliance with the limitations period"), *overruled on other

grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

To meet this standard, Trustee argues that Plaintiff does "not describe any

purported misconduct that would give rise to" liability, and that "the Complaint is devoid

of any description of a dishonest purpose, self-interest or ill will on the part of the

Trustee."  (Docket No. 30, p.5 & n.6.)  The Court disagrees; the Complaint in this case

clearly alleges facts showing bad faith or, at a minimum, gross negligence.

To begin with, the Complaint specifically alleges that "Trustee's numerous and

material breaches of its contractual duties" constitute "bad faith."  (Docket No. 5 ¶ 48.)

Trustee refers to this allegation as conclusory—but the allegation draws on dozens of

paragraphs of specific facts allegedly showing breach of contractual and fiduciary

16

duties.  (*E.g.*, *id.* ¶¶ 137–54 (breach of duty to collect financial information from ECA);

¶¶ 164–84 (breach of duty to obtain independent appraisal); ¶¶ 243–54 (breach of duty

of due diligence in verifying ECA's claims and representations); ¶¶ 255–72 (breach of

duty to hold auction under specified profit-maximizing conditions); ¶¶ 309–17 (breach of

duty to call meeting of Unitholders); ¶¶ 318–26 (breach of duty to obtain majority vote

for amending Trust Agreement); ¶¶ 327–34 (breach of duty to make material

disclosures).)  Plaintiff has pleaded contractual breach to a very high degree of factual

specificity.  Further, Plaintiff alleges that Trustee actively concealed its misconduct (*id.*

¶ 184), and filed false and misleading statements with the Securities and Exchange

Commission (*id.* ¶¶ 288–94).  In the aggregate, these allegations are more than enough

to raise an inference of bad faith—and at this stage of proceedings, the Court is

required to draw that inference in Plaintiff's favor.

Moreover, Trustee ignores the part of the exculpatory clause that says "gross

negligence."  The Complaint is replete with allegations of negligent behavior.  Plaintiff

alleges that Trustee received no financial information from ECA other than quarterly

checks (*id.* ¶¶ 147–48)—not quarterly statements (*id.* ¶ 140), nor annual statements (*id.*

¶ 141), nor copies of ECA's books (*id.* ¶¶ 145–46), nor independent audits (*id.* ¶ 151),

all of which were either required or available under the Trust Agreement.  These facts

quite possibly rise to the level of gross negligence.

There is no "obvious bar to securing relief on the face of the complaint," even in

light of the exculpatory clause.  Accordingly, to the extent Trustee's motion to dismiss

relies on the exculpatory clause, the motion should be denied.

### B.    Count I: Contractual or Structural Harms as Direct Claims

Trustee argues that Count I is in substance a shareholder's derivative claim, rather than a direct claim, and should be dismissed for failure to follow the rules for derivative actions.  Plaintiff admits that it has not complied with Federal Rule of Civil Procedure 23.1 or any of the state-law prerequisites for derivative claims.  Therefore, if the Court agrees that Count I does not state a direct claim, it must be dismissed.

As stated above, Delaware law states a two-prong test for distinguishing direct claims from derivative claims: "Th[e] issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  *Tooley*, 845 A.2d at 1033.  In applying the test, "the focus should be on the person or entity to whom the duty is owed."  *Id.* at 1036 n.9 (citing *Agostino v. Hicks*, 2004 WL 443987 (Del.Ch. March 11, 2004), and 2 American Law Institute, Principles of Corporate Governance: Analysis and Recommendations § 7.01(b) at 17).

Corporate-waste or equity-dilution claims are usually derivative; it's the business entity that suffers the harm, and it's the business entity that ought to sue for that harm. *Feldman v. Cutaia*, 951 A.2d 727, 732–33 (Del. 2008); *Kramer v. W. Pac. Indus. Inc.*, 546 A.2d 348, 352–53 (1988).  By contrast, where management breaches specific duties owed to shareholders, those injuries are borne by shareholders and give rise to direct claims by those shareholders.  *Tooley*, 845 A.2d at 1039.  As also noted above, transactions can give rise to both derivative and direct claims, where the management

breaches duties owed to shareholders while also harming the business entity.  *Gentile*, 906 A.2d at 99–100 & n.19; *Grimes v. Donald*, 673 A.2d 1207, 1212 (Del. 1996), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  But Delaware courts are not quick to allow this result: where the injury is in substance just a matter of mismanagement, Delaware courts refuse to allow the claim to proceed directly even if it involves a breached duty owed to the shareholders.  *See, e.g.*, *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 771–74 (Del. 2006).  Rather, Delaware treats such claims as little more than corporate-waste or equity-dilution claims, improperly "bootstrapped" into a direct action.  *See, e.g.*, *Feldman*, 951 A.2d at 729 ("The Court of Chancery characterized Feldman's contention that Count XIII states a direct claim as 'a bootstrap argument.'"); *Protas v. Cavanagh*, 2012 WL 1580969, at *6 (Del. Ch. May 4, 2012) ("Avoiding the demand requirement by restating a derivative claim under the guise of a direct claim 'alleging the same fundamental harm in a slightly different way' is the type of bootstrap allegation that this Court has consistently rejected.").

Plaintiff argues that Count I is a "dual character" claim, in which Trustee breached duties owed to Unitholders in addition to harming the trust.  Trustee, by contrast, argues that Count I is a bootstrapped claim.  Trustee doesn't dispute that the facts allege breach of various contractual duties to conduct the royalty sale according to certain rules and procedures.  But it argues that the resulting harm is simply one of mismanagement, of a failure to maximize profit—*i.e.*, a claim of corporate waste.  As a

result, Trustee says, Count I is a purely derivative claim that can't be bootstrapped into a direct action.

The Court agrees with Trustee.  Plaintiff suggests that the mere fact that the Trust Agreement's provisions are contract terms means that a claim for the breach of those provisions is a direct claim.  It is true that the Delaware legislature intends for business trusts (and other alternative business entities) to empower the parties with greater flexibility to arrange their affairs contractually.  Del. Code Ann. tit. 12, § 3825(b) (West) ("It is the policy of this subchapter to give maximum effect to the principle of freedom of contract and to the enforceability of governing instruments.").  But it cannot be true that any *ultra vires* act by the trustee of a business trust gives rise to a direct claim—if that were the case, then *Tooley* wouldn't apply to business trusts at all.  *Tooley* does apply to trusts, just as it applies to all of Delaware's alternative business entities.  *See Protas*, 2012 WL 1580969, at *4-8 (applying *Tooley* to statutory business trust); *Litman v. Pudential-Bach Props., Inc.*, 611 A.2d 12, 15 (Del. Ch. 1992) (test is substantially the same for limited partnerships as for corporations).  Thus, it is not enough to ask whether the partnership agreement was breached.  Rather, as *Tooley* dictates, the Court must look to the specific provisions breached and determine "to whom the [breached] duty is owed."  *Tooley*, 845 A.2d at 1036 n.9.

Here, the Court does not see any basis for concluding that the auction-and-sale duties at issue were owed to Unitholders specifically, as opposed to the corporation.  For example, Trustee's duty to procure an independent appraisal was for ECA's benefit, for use in deciding whether to exercise its right of first refusal *before* any auction or

20

proposed sale.  (Trust Agreement §  9.03.)  Further, a separate provision for an

independent appraisal was effectively waivable *by ECA* (Trust Agreement §  9.04)—

suggesting that the provision existed to protect ECA, not the Unitholders.  The only

provision at issue that can be said to protect Unitholders is the requirement that auction

packets be mailed to Unitholders no less than 60 days prior to the auction.  (Trust

Agreement §  9.03.)  But that is a simple disclosure violation—and there is no

reasonable way to trace Plaintiff's alleged injuries to that violation.  *See J.P. Morgan*

*Chase*, 906 A.2d at 771–74.  The auction-and-sale provisions cannot be said to be

structural in any sense; they govern the Trustee's management of the trust, and

therefore do not create duties *to the Unitholders*.

Plaintiff cites to a number of cases in which breach of the terms in a business

entity's organizing charter gave rise to direct claims.  But in each case, those terms

created duties running to shareholders specifically, in their individual capacities—and

usually, to minority interests vis-à-vis controlling interests.  *See, e.g.*, *Allen v. El Paso*

*Pipeline GP Co.*, 90 A.3d 1097 (Del. Ch. 2014) (direct claim by limited partners where

general partner breached terms of partnership agreement for sanitizing self-dealing

transactions); *Grayson v. Imagination Station*, 2010 WL 3221951 (Del. Ch. Aug. 16,

2010) (direct claim where shareholders representing majority bloc breached voting

agreement and knocked minority shareholder's directors off of board, ); *MCG Capital*

*Corp. v. Maginn*, 2010 WL 1782271 (Del. Ch. May 5, 2010) (direct claim where inside

directors violate consent rights held by investor-shareholder, negotiated as part of both

the corporate charter and related side agreements).  In none of these cases, except

arguably *Allen*, did the breached provision protect the business entity itself from mismanagement or malfeasance by the controlling interest.  Rather, they protected the shareholders or limited partners directly.  Here, by contrast, the allegedly breached provisions all concern managing the affairs of the trust—they do not concern the Unitholders' rights as Unitholders, and they do not involve any duties running specifically to Unitholders.  As a result, Plaintiff's cases are inapposite.

The Court concludes that Count I is a "bootstrap" claim, attempting to bring an inherently derivative claim in direct guise.  Accordingly, the Court recommends that Count I be dismissed.

### C.     Count V: Equitable Accounting from Trustee

Plaintiff's claim for an equitable accounting from Trustee is predicated on the rights asserted in Counts I and II.  Because the Court recommends that Count II go forward, the alternative remedy of an accounting should also go forward insofar as it depends on Count II.

### Recommendation

For the foregoing reasons, the undersigned RECOMMENDS that:

- Defendant Bank of New York Mellon Trust Company's Amended Motion to Dismiss (Docket No. 30) be GRANTED as to Count I but DENIED as to Count II and V; and

- Defendant Energy Corporation of America's Amended Motion to Dismiss (Docket No. 32) be GRANTED in all respects.

22

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2),**

**the parties have fourteen (14) days after service of this recommendation to serve**

**and file specific written objections to the above recommendation with the District**

**Judge assigned to the case.  A party may respond to another party's objections**

**within fourteen (14) days after being served with a copy.  The District Judge need**

**not consider frivolous, conclusive, or general objections.  A party's failure to file**

**and serve such written, specific objections waives de novo review of the**

**recommendation by the District Judge, <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53**

**(1985), and also waives appellate review of both factual and legal questions,**

**<u>Makin v. Colo. Dep't of Corr.</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>,**

**91 F.3d 1411, 1412-13 (10th Cir. 1996)**.


Dated:       September 3, 2015              */s/ Michael J. Watanabe*
             Denver, Colorado              Michael J. Watanabe
                                           United States Magistrate Judge